FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR -9 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
YEFIM MORCHIK,

        Petitioner,

   -against-

UNITED STATES OF AMERICA,

        Respondent.
------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
1:12-cr-00617-CBA-7
1:18-cv-03088-CBA

**AMON, United States District Judge:**

Before the Court is Petitioner Yefim Morchik's motion to vacate his sentence pursuant to 28 U.S.C. § 2255. Morchik pleaded guilty to Count Two of an indictment, conspiracy to receive and pay healthcare kickbacks in violation of 18 U.S.C. § 371, pursuant to a cooperation agreement on August 29, 2013. (D.E. # 142.) On December 9, 2016, Morchik was sentenced to thirty-four months imprisonment. (D.E. dated December 9, 2016.) Morchik's motion challenges aspects of his sentencing on the basis that his counsel provided ineffective assistance in violation of his Sixth Amendment rights. See generally Strickland v. Washington, 466 U.S. 668 (1984). For the reasons stated below, the Court denies Morchik's motion.

## BACKGROUND

### I. Role in the Offense

Morchik pleaded guilty to conspiracy to receive and pay healthcare kickbacks in violation of 18 U.S.C. § 371, based on his role in a fraudulent Medicaid billing scheme centered around the healthcare provider Cropsey Medical Care, PLLC. Cropsey Medical Care, PLLC paid kickbacks to patients so that it could submit fraudulent Medicaid bills on their behalf between November 2009 and October 2012. (D.E. # 1 ("Indictment") ¶ 18.) It also received kickbacks from certain other healthcare providers in exchange for referring patients to them. (Id. ¶¶ 19–20.)

1

A plea hearing was held on August 29, 2013. At the hearing, Morchik allocuted to the following:

> From June 2010 through May 2012, during which time I was employed by G&M Ambulette Service, I agreed with others to pay cash kickbacks and receive cash back from Cropsey Medical Care, PLLC. In return for the kickbacks that I paid, Cropsey referred patients to G&M to transport them to and from Cropsey. G&M billed Medicaid for its services.
>
> During the same period, I agreed with an employee of Cropsey to refer Medicare patients to Cropsey in return for which I receive [sic] kickbacks. I knew that paying and receiving kickbacks was wrong.
>
> On January 5, 2012, I paid cash kickbacks to an employee of Cropsey in a car in Brooklyn.

(D.E. # 463-16 ("Plea") at 31.) Magistrate Judge Orenstein also questioned Morchik about the full scope of the conspiracy. He mentioned that the indictment referred to the time period November 2009 through October 2012 and noted "with respect to the timing, the government wouldn't have to prove that you were involved in this agreement for that whole time, but just that at some time during that period, you either entered into the agreement or you or somebody else while you were a member of that agreement did something to make it succeed." (Id. at 14.) Judge Orenstein asked if Morchik understood, to which he responded "Yes." (Id.)

## II. Cooperation

Morchik was arrested on October 4, 2012. (D.E. # 18.) From the time of his arrest through the weeks prior to his guilty plea, Morchik was represented by Arkady Bukh (counsel of record for this motion) and Nicholas Woolridge of Bukh & Associates, P.C. (D.E. # 22–23) During that period, Morchik met with the government on several occasions, admitted to his role in the scheme, and made recordings with individuals at Cropsey. (D.E. # 463-1 ("Fatico Transcript") at 115–19.)

Morchik then retained new counsel—Jonathan Marks—who entered an appearance on August 15, 2013. (D.E. # 136.) The Government and Morchik agreed that he would plead guilty

2

pursuant to a written cooperation agreement on August 29, 2013. (D.E. # 142, 463-2.) That agreement required Morchik to "provide truthful, complete and accurate information" to the Government in addition to testifying at any proceedings requested by the Government. (D.E. # 463-2 ("Cooperation Agreement") at 3.) On January 29, 2014, Albert Dayan, Esq., the attorney Morchik now alleges provided ineffective assistance of counsel, entered an appearance on Morchik's behalf. (D.E. # 193.) Morchik's cooperation continued thereafter.

The Government states that, in 2015, it became concerned that Morchik had been offering untruthful testimony about co-defendant Pavel Zborovskiy both before and after Morchik signed his cooperation agreement. (D.E. # 471 ("Gov. Br.") at 5.) Special Agent Delaney testified that she set up a meeting with Morchik in March of 2015 in preparation for upcoming Fatico hearings for co-defendants Pavel Zborovskiy and Igor Ishchuk. (Fatico Transcript at 22.) At that meeting, Morchik said—consistent with his post-arrest statements—that he knew who Zborovskiy was, but that he was not aware of Zborovskiy's relationship with G&M Ambulette Services. (Id. at 23.) But these statements appeared to conflict with the statements and recordings of another cooperator which suggested that Morchik and Zborovskiy had worked together within the scope of the conspiracy. (Id. at 29–30.)

These apparent inconsistencies transformed into problems with Morchik's cooperation later in 2015. Morchik failed to appear at meetings with the Government in July and August in which the Government sought to explore the information he had given them with regard to Zborovskiy. (Id at 57.) Morchik claims that "[p]rior to that meeting, [he] had several encounters with Mr. Zborovskiy and his associates, during which [he] was threaten [sic] that if [he] testified against Mr. Zborovskiy, [he] and/or [his] family members would be physically hurt." (D.E. # 465 ("Morchik Decl.") ¶ 2.) Morchik claims that he came to both scheduled meetings but was advised

3

by Dayan that "it was not in [his] best interest to meet with the government." (Id. ¶ 4.) Morchik also claims that Dayan "respected [his] decision not to testify against Mr. Zborovskiy because of [his] fear for safety" and that Dayan "never advised [him] that [his] refusal to testify against Mr. Zborovskiy would constitute a breach of cooperation agreement [sic]." (Id. ¶ 3.)

Morchik ultimately met with the Government on October 7, 2015. (Fatico Transcript at 57.) At that meeting, Morchik explained to the Government why he felt threatened by Zborovskiy. (Id. at 58–61.) He was once again asked substantive questions about his relationship with Zborovskiy. He responded consistent with his post-arrest and March statements. (Id. at 62.) In the meeting, Morchik made clear that he was unwilling to testify against Zborovskiy. (Id.)

The Court held a Fatico hearing on October 13, 2016 to explore whether Morchik was dishonest in his cooperation with the Government. (D.E. dated October 12, 2016.) Morchik claims that "Mr. Dayan never explained to [him] the purpose and significance of [his] Fatico hearing and did not permit [him] to testify despite [his] willingness to do so." (Morchik Decl. ¶ 11.) Dayan refutes this claim, stating that he "informed [Morchik] that if he testified dishonestly he could be charged with obstruction" and that "[i]t was Mr. Morchik's decision not to testify." (D.E. # 476 ("Dayan Decl.") ¶ 15.) Morchik ultimately did not testify at the Fatico hearing. Toward the close of the hearing, Dayan indicated that he would include in his sentencing submission "a couple of paragraphs" about the hearing, (Fatico Transcript at 142), but he failed to do so, (see generally D.E. # 418). At his sentencing on December 9, 2016, Judge Townes concluded that Morchik did in fact lie about Zborovskiy to the Government, (D.E. # 463-3 ("Sent. Transcript") at 4), but that there was—in any event—"no issue" whether he "deserve[d]" a 5K1.1 letter because Morchik "conceded that he did not deserve this letter because he had violated the conditions of his cooperation agreement in that he failed to meet with the Government as requested and he refused

4

to testify when asked to do so," (id. at 3). Judge Townes ultimately concluded that her ruling about Morchik's dishonesty "does not affect the guidelines range or anything in this case." (Id. at 5.)

### III. Sentencing Submissions

Probation filed an initial Presentence Investigation Report ("PSR") on July 28, 2015, (D.E. # 320), as well as two addenda—one filed October 5, 2016, (D.E. # 408), and one on December 8, 2016, (D.E. # 423). Morchik now challenges the accuracy of a few statements in the PSR, including that he "recruited patients from the Brooklyn Russian immigrant community," (PSR ¶ 28), that he was an ambulette driver, and that he received $40 kickbacks from co-defendant Irina Barikyan.[1] (D.E. # 463 ("Def. Br.") at 34.) Among its other recommendations, Probation provided some background on Morchik's background and family life. (PSR ¶¶ 79–85.) The PSR also remarked on Morchik's health, noting that he had two stints placed in his heart following a heart attack, was diagnosed with high blood pressure and cholesterol, and suffers panic attacks. (Id. ¶¶ 86–87.) A later addendum shows that Morchik provided Probation with a report from Dr. Enikeev verifying his anxiety and also diagnosing him with depressed mood and insomnia. (D.E. # 408.)

The Government submitted a sentencing memorandum on July 5, 2016. (D.E. # 371.) Relying on United States Sentencing Guidelines § 2B4.1(b)(1), the Government calculated the loss amount attributable to Morchik to be $2,080,944: "$1,518,586, the amount Cropsey billed Medicare billed for claims associated with G&M beneficiaries; and $562,358, the amount G&M billed Medicaid for patients transported to Cropsey." (Id. at 4.) This calculation resulted in a total offense level of 21, corresponding to a guidelines range of 37 to 46 months. (Id. at 3.) The Probation Department adopted this calculation in its second addendum to the PSR. (D.E. # 423.)

---

[1] These second and third alleged inaccuracies do not appear in any Probation department submissions.

Dayan submitted a sentencing memorandum on behalf of Morchik on November 23, 2016. (D.E. # 418.) In broad strokes, that submission argued that Morchik should be given a below-guidelines sentence because he had the support of his family, (id. at 2–3), because cultural differences kept him from understanding the severity of his crimes, (id. at 3–4), and because he was genuinely remorseful about what he had done, (id. at 5). Morchik claims he was not shown this memorandum before it was submitted and that several statements contained therein were false. (Morchik Decl. ¶ 12.) Dayan failed to include several letters written in support of Morchik, as well as the medical reports submitted by several of Dayan's doctors. (D.E. # 463-20, at 2.) He also failed to offer any objections to the PSR, despite his alleged commitment to do so in a meeting with Morchik. (Morchik Decl. ¶¶ 9–10.) Several emails and text messages submitted in connection with this motion show that Morchik was not pleased with the attention Dayan was showing to his case in the time-period leading up to his sentencing. (D.E. # 463-14, -17, -20.)

## IV. Sentencing

Morchik was sentenced on December 9, 2016. (D.E dated December 9, 2016.) After presentations from Dayan, the Government, and Morchik, Judge Townes set out the reasoning behind her sentence. She noted that "there is no question how serious this offense is" and that the "defendant knew exactly what he was doing." (Sent. Transcript at 26–27.) She "[took] into consideration [Morchik's] cooperation, but [found] that his dishonesty and refusal to testify in this case almost negates what he ha[d] done." (Id. at 27.) As noted above, Judge Townes concluded that the matters discussed at the Fatico hearing "d[id] not affect the guidelines range or anything in this case." (Id. at 5.) She also took into account the "history and characteristics of the defendant as described to [her] by the Government, by the Defense Counsel, and the Pre-Sentence Report" before concluding that the sentence imposed "must result in general and specific deterrence; also,

promote respect for the law, and; also, punish the defendant." (Id.) She concluded: "I am sentencing Mr. Morchik below the advisory guideline range, but not very far below: 34 months in the custody of the Attorney General." (Id. at 28.)

* * *

In the present motion, Morchik argues that Dayan rendered ineffective assistance in the course of the events described above at a level which deprived him of his Sixth Amendment rights. He seeks vacatur of his thirty-four month sentence.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2255, federal prisoners may seek post-conviction relief for sentences "imposed in violation of" federal law, entered by courts "without jurisdiction," issued "in excess of the maximum authorized by law," or "otherwise subject to collateral attack." 28 U.S.C. § 2255(a); see also Adams v. United States, 372 F.3d 132, 134 (2d Cir. 2004). The Court also "shall vacate and set the judgment aside" if, among other things, the Court finds that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). A petitioner may raise a claim of ineffective assistance of counsel for the first time in a § 2255 motion. Massaro v. United States, 538 U.S. 500, 504 (2003). On other claims, if a petitioner procedurally defaults "by failing to raise [them] on direct review," a court generally may not hear them on § 2255 review. Bousley v. United States, 523 U.S. 614, 622 (1998).

## DISCUSSION

Each of Morchik's arguments challenge the adequacy of Dayan's representation at and leading up to sentencing. Ineffective assistance of counsel claims are decided under the framework of Strickland v. Washington, 446 U.S. 668 (1984). "Under Strickland, in order to prevail on an

7

ineffective-assistance-of-counsel claim, a defendant must meet a two pronged test: (1) he 'must show that counsel's performance was deficient,' so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance,' and (2) he must show 'that the deficient performance prejudiced the defense,' in the sense that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Bennett v. United States, 663 F.3d 71, 84 (2d Cir. 2011) (quoting Strickland v. Washington, 466 U.S. at 687, 690, 694). "With respect to a claim of ineffective assistance in sentencing, the defendant must show a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence." Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013).

Morchik argues that five aspects of Dayan's representation were constitutionally deficient under this standard:

(1) Dayan's failure to dispute specific aspects of the PSR;

(2) Dayan's failure to raise specific arguments at the sentencing hearing and in his submissions;

(3) Dayan's failure to inform him that refusal to testify would constitute a breach of his cooperation agreement;

(4) Dayan's refusal to allow him to testify at his Fatico hearing; and

(5) Dayan's failure to adequately communicate.

None of these arguments establish Dayan's deficient performance.

I.  **Objections to the PSR**

Morchik argues that his guidelines range was "unjustifiably increased" by sixteen levels[2] because of Dayan's failure to make pertinent objections to the PSR. (Def. Br. at 32.) Specifically, he argues that Dayan should have objected to the inclusion of:

   (1) The loss caused by Cropsey's fraudulent billing in his loss amount. (Id. at 32.)

   (2) The loss caused before Morchik joined the conspiracy, and after he made his last kickback in furtherance of it. (Id. at 32–33.) And,

   (3) Several factual inaccuracies. (Id. at 34–35.)

None of these failures to object violated Morchik's Sixth Amendment rights.

Regarding the amounts billed by Cropsey, Judge Townes correctly included these bills when calculating the loss amount attributable to Morchik. Judge Townes (and the PSR) applied United States Sentencing Guideline § 2B4.1 which directs the Court to increase a defendant's offense level based on the value of "the improper benefit to be conferred." USSG § 2B4.1(b)(1). Because Morchik pled guilty to conspiracy under 18 U.S.C. § 371, the Court was required to apply Guildeline § 1B1.3(a)(1)(B)(iii), which requires "in the case of a jointly undertaken criminal activity . . . , all acts and omissions of others that were reasonably foreseeable in connection with that criminal activity" to be taken into account in determining offense levels. Here, Morchik paid kickbacks to Cropsey so that G&M could provide ambulette services to Cropsey's patients. It was "reasonably foreseeable" that these patients would also have illegal Medicare bills submitted on their behalf for services they received (or did not receive) while at Cropsey. Since the challenge

---

[2] By this, Morchik appears to mean that a 16-level loss amount enhancement was applied rather than a 14-level enhancement.

9

had no merit, Dayan's failure to object to this application of the Guidelines did not render his assistance ineffective.

Inclusion of loss amount incurred both before and after Morchik actively participated in the conspiracy was also proper under the Guidelines. "In general, 'one who joins an existing conspiracy takes it as it is, and is therefore held accountable for the prior conduct of co-conspirators." United States v. Bengis, 783 F.3d 407, 413 (2d Cir. 2015) (quoting United States v. Sansone, 231 F.2d 887, 893 (2d Cir. 1956)). In the context of drug conspiracies and restitution orders, the Second Circuit has held that a defendant should be held accountable for past conduct "if, when he joined the conspiracy, he could reasonably foresee" or "knew or reasonably should have known" of past conduct. Id. (citing United States v. Miranda-Ortiz, 926 F.2d 172, 178 (2d Cir. 1991). Here, Morchik admitted that he understood the full scope of the conspiracy when he pled guilty to a conspiracy charge spanning from "November 2009 to October 2012." (D.E. # 1, at 5.) And although Morchik "allocuted that on or about May 1, 2012 he stopped paying [] kickbacks," this does not alter his responsibility for subsequent losses. (D.E. # 473 ("Def. Reply") at 12.) "'[T]o avert a continuing criminality' there must be 'affirmative action . . . to disavow or defeat the purpose' of the conspiracy." Smith v. United States, 568 U.S. 106, 113 (2013) (quoting Hyde v. United States, 225 U.S. 347, 369 (1912)). Morchik has pointed to no such action. Given that the loss amounts that occurred before and after Morchik's participation in the conspiracy were properly included in the loss amount, Dayan was not ineffective for failing to object.

Morchik's argument that Dayan failed to object to incorrect "factual postulates of the offenses scheme [sic]," (Def. Br. at 34), is furthest afield. He claims that Dayan should have objected to three inaccuracies in the PSR: (1) that Morchik was an ambulette driver; (2) that Morchik was a "recruiter from Brooklyn Russian community [sic]"; and (3) that a co-defendant

paid Morchik forty dollars "to pass through each patient." (Id.) The first and third statements do not appear in the PSR. The second is consistent with Morchik's own admissions. To date, his moving papers admit that Morchik recruited eight patients on behalf of G&M and Cropsey. (Def. Br. at 17 ("He personally recruited only 8 patients."); Def. Reply at 4 ("[H]e simply referred 8 people to Cropsey.").) Further, even assuming that these facts were misstated in the PSR, nothing in the sentencing transcript indicates that Judge Townes relied on them in imposing Morchik's sentence. Showing prejudice is requisite to a claim of ineffective assistance of counsel.

* * *

The short of the matter is that Dayan did not commit error in failing to make the objections to the PSR that Morchik now insists he should have made.

## II. Arguments at Sentencing

Morchik also takes issue with the way Dayan handled his case through his sentencing submission and in his presentation at sentencing. He argues that Dayan:

(1) Did not compare Morchik to other defendants who had already been sentenced, (Def. Br. at 33);

(2) Failed to emphasize Morchik's cooperation in his sentencing letter, (Def. Br. at 35–36); and

(3) Failed to submit medical records and letters of support despite his promise to do so, (Def. Br. at 36, 41–42);

These arguments are once again without merit.

At sentencing and in his papers, Dayan decided to focus on Morchik's remorsefulness, support from his family, and the cultural differences that prevented him from understanding the seriousness of his crime. His decision to do so is exactly the sort of "strategic choice[]" that the Strickland Court described as "virtually unchallengeable." 466 U.S. at 690. That is because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety

11

of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688–89. For this reason, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. Dayan focused on factors at sentencing that Morchik now believes were not the best. But this Court's function is not to second-guess the strategic choices of counsel. "[T]here are countless ways to provide effective assistance in any given case" and "even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689.

In any event, Morchik has not shown that these strategic decisions prejudiced him in any way. Morchik complains that Dayan did not "compare other co-defendants' exposure and attributable amount of loss," (Def. Br. at 33), but he does not explain which co-defendants received sentences that would serve as a helpful comparison for showing his relative lack of culpability.[3] Further, although Dayan did not emphasize Morchik's attempts at cooperation in his sentencing submission, he discussed Morchik's cooperation at length at sentencing. (See Sent. Transcript at 9–12 (discussing both "private historical cooperation" and "proactive cooperation," including that Morchik wore wires, went to meetings, and conducted video recordings).) And although Dayan failed to submit letters of support and medical records on behalf of Morchik, the PSR detailed Morchik's family life, (PSR ¶¶ 83–84), and health, (PSR ¶¶ 85–86); an addendum to the PSR detailed Morchik's medical conditions, (D.E. # 408); and Dayan's sentencing submission reflected

---

[3] Dayan did offer some comparison of Morchik to his co-conspirators at his sentencing hearing, noting that Morchik agreed to pay $55,000 in restitution, "five times more than every other defendant in this case that has pled guilty and has been imposed restitution." (Sent. Transcript at 11–12.)

12

the same information, (D.E. # 418, at 2–3, 4). At sentencing, Morchik himself reiterated that he was in poor health. (Sent. Transcript at 26.) In other words, information about Morchik's family and health was before Judge Townes when she sentenced him. She plainly took this information into account when setting the conditions of Morchik's incarceration. (D.E. # 29 ("Yes, I will recommend mental health treatment . . . ."); id. at 31 (granting surrender date one month out to avoid the "tremendous shock with his health condition").) Morchik has failed to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

### III. Breach of the Cooperation Agreement

Next, Morchik argues that "Mr. Dayan's neglect and erroneous advices [sic] in connection with defendant's cooperation substantially contributed to the breach of the cooperation agreement and to the government's failure to file a substantial assistance letter." (Def. Br. 36–37.) Putting aside the factual dispute whether Dayan in fact informed Morchik that his course of conduct would breach the cooperation agreement,[4] this alleged error does not satisfy either prong of Strickland.

First, "counsel's performance" is not deficient when he fails to inform a client of something which he already knows. Here, Morchik does not allege that Jonathan Marks—his attorney at the time the cooperation agreement was signed—failed to inform him of the contents of his agreement or that his entry into that agreement was in some other way unknowing. And the cooperation agreement is clear by its own terms. It required Morchik to provide "truthful, complete and accurate information" and to "testify at any proceeding in the Eastern District of New York or elsewhere as requested by the Office." (D.E. # 463-2, at 3.) In other words, it was abundantly

---

[4] Dayan averred: "I advised Morchik that his refusal and unwillingness to meet with the Government and testify against Pavel Zborovskiy would be considered a breach of his cooperation agreement." (D.E. # 476.)

clear that Morchik's failure to testify against Zborovskiy would constitute a breach of his cooperation agreement. Morchik's other allegations of ineffectiveness, for example, that he "was also held completely in the dark by Mr. Dayan as the government wanted to talk to him," (Def. Br. at 37), is also belied by the record. As is clear from the Fatico hearing and Morchik's own submissions, Morchik met with the Government on October 7, 2015 and affirmatively refused to testify against Zborovskiy. (Def. Br. at 12; Fatico Transcript at 58.)

Second, there is no reasonable probability that any alleged errors prejudiced Morchik. One of the three reasons the Government gave for refusing to file a 5K1.1 letter on Morchik's behalf is that "the government no longer f[ound] the defendant to be credible and believe[d] that he purposely failed to disclose all that he knew about Zborovskiy both before and after he entered into the cooperation agreement." (D.E. # 404, at 6.) Morchik's dishonesty—dating from long before Dayan began to represent him—cannot be attributed to any alleged ineffectiveness in Dayan's representation.

## IV. Testimony at the Fatico Hearing

Morchik also argues that "Mr. Dayan[] never explained to the defendant the purpose and the significance of his Fatico hearing and did not permit him to testify despite his willingness to do so." (Def. Br. at 40.) Under Rock v. Arkansas, 483 U.S. 44, 49 (1987), "a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." However, "[w]hile the Supreme Court has acknowledged the absolute personal right to testify at one's trial, it is still an open question whether the same right applies to the defendant's testimony at a pre-trial hearing." Hawthorne v. Spitzer, No. 07-CV-4128 (NG), 2010 WL 3803861, at *1 (E.D.N.Y. Sept. 20, 2010). Morchik has not pointed to any case extending the Rock right to testify

to the context of a Fatico hearing. Assuming arguendo that Morchik had a right to testify,[5] he has not shown that his right was violated or that any violation caused him prejudice.

First, the Court finds that as a factual matter Dayan did not stop Morchik from testifying at the Fatico hearing. On this point, Morchik averred that "Mr. Dayan[] never explained to [him] the purpose and the significance of his Fatico hearing and did not permit [him] to testify despite [his] willingness to do so." (Morchik Decl. ¶ 11.) In contrast, Dayan averred that "[he] informed Mr. Morchik exactly what the purpose of the Fatico hearing was. [He] informed him that he had the right to testify. [He] also informed him that if he testified dishonestly he could be charged with obstruction. It was Mr. Morchik's decision not to testify." (D.E. # 476, at 5–6.)

This Circuit "permits a middle road of deciding disputed facts on the basis of written submissions," in resolving § 2255 motions. Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011) (quoting Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003)). Here, Morchik's "blanket statements that counsel had prohibited him from testifying" are "belied" by Dayan's entirely plausible explanation of why Morchik chose not to testify. Id. (discussing Chang v. United States, 250 F.3d 79, 81–82, 85 (2d Cir. 2001)). As in Chang v. United States, Morchik's "proffer involve[s] a generic claim—one that can be, and is often, made in any case in which the defendant fails to testify—based solely on his own highly self-serving and improbable assertions." Chang, 250 F.3d at 86. And, as in Chang, "a full testimonial hearing . . . would add little or nothing to the written submissions." Morchik's claim is simply not credible.[6] The Court therefore finds on the

---

[5] The Court is inclined to agree with then-Judge Sotomayor "that the decision to put the defendant on the stand in a pretrial evidentiary hearing has no special constitutional status beyond the right to present evidence on one's own behalf and is thus committed, as are all decisions about which witnesses to call or not call, to trial counsel's professional judgment."). Narvaez v. United States, No. 97-CV-8745, 1998 WL 255429, at *5 n.6 (S.D.N.Y. May 19, 1998) (Sotomayor, J.).

[6] As detailed within this opinion, Morchik has a history of not being candid. At sentencing, Judge Townes concluded that Morchik "was not . . . truthful" with the Government during his attempt to cooperate. (Sent. Transcript at 5.)

basis of Morchik and Dayan's affidavits that Morchik has failed to establish that he was denied his right to testify, if any such right exists.

Second, even had Dayan violated Morchik's right to testify, that violation did not cause Morchik any prejudice. "[A]ny claim by the defendant that defense counsel has not discharged [his responsibility under Rock]—either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify—must satisfy the two-prong test established in Strickland v. Washington, 466 U.S. 668 (1984), for assessing whether counsel has rendered constitutionally ineffective assistance." Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997). The purpose of the Fatico hearing was to determine whether Morchik was honest during his attempt to cooperate with the Government. (Fatico Transcript at 2.) Morchik averred in his affidavit—and counsel reiterated in the § 2255 brief—that had he testified at his Fatico hearing, he "was going to tell the court the circumstances of the case, details of [his] pro-active cooperation, which the testifying agent simply could not remember, and the reasons for failure to communicate with the government." (Morchik Decl. ¶ 11; Def. Br. at 40.) But it is unclear how any of these showings would have vitiated Judge Townes' eventual conclusion that Morchik was not being honest with the Government when discussing his relationship with Zborovskiy. (Sent. Transcript at 4–5.) And even if his testimony would have been material, it did not effect Judge Townes's ultimate sentence. (See id. at 5 (explaining that the resolution of the issue discussed at the Fatico hearing "does not affect the guildelines range or anything in this case.").) Morchik's failure to establish any prejudice caused by his not having testified at his Fatico hearing is another reason to reject his claim.

## V. Dayan's Communication

Finally, Morchik stresses that there were communication problems between him and Dayan shortly prior to sentencing that adversely impacted his sentence. (Def. Br. at 37–39.) He claims that Dayan's lack of communication (which is reflected in several email exchanges and text messages, (see D.E. # 463-14, -20)) prejudiced his ability to present a defense because it, among other things, "caused Mr. Dayan's letter and the sentencing speech to contain factual errors and to omit critical individualized personal characteristics." (Def. Br. at 39.) For example, Dayan allegedly made up some details about Morchik's life in the Soviet Union and about his work as a cab driver while omitting certain information about his personality and prior achievements. (Id.)

The Court has reviewed the record underlying these allegations and determines that none of the alleged errors are sufficiently serious to constitute a constitutional violation. Cf. Cheng Chui Ping v. Willingham, 746 F. Supp. 2d 496, 501 (S.D.N.Y. 2010) ("Cheng was not prejudiced by Hochheiser's failure to present mitigating character testimony during the sentencing phase."). The alleged factual inaccuracies that Dayan put forth at sentencing were at the level of minor detail and are unlikely to have impacted Judge Townes' calculus one way or another. And Morchik has not pointed to any particular "prior achievements" or "personality" traits, (Def. Br. at 39), that would have caused Judge Townes to impose a sentence other than the one she did. Cf. id. at 500 ("The Court is not persuaded that Cheng was prejudiced by Hochheiser's failure to adequately consult with her. Cheng has not made any specific allegations that this purported lack of communication weakened her case.").

The Court therefore finds that the communication problems between Dayan and Morchik prior to sentencing did not cause his resulting sentence to be constitutionally infirm.

## CONCLUSION

For the foregoing reasons, the Court DENIES Morchik's § 2255 motion. Because he has not made a substantial showing of the denial of any constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253. The Court also respectfully directs the Clerk of Court to close the case in No. 1:18-CV-03088-CBA.

SO ORDERED.

Dated: April 9, 2019
      Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge